DECISION
This matter is before the Court for a decision on petitioners' appeal of the Bristol Probate Court's admission of the Last Will and Testament of Louise Enwright Walsh. Petitioners allege that the decedent lacked the testamentary capacity necessary for issuing a valid will and was the victim of undue influence. They further complain that the respondent/executor failed to file a proper inventory of the decedent's assets as required by R.I.G.L. § 33-9-1.
Louise Enwright Walsh, born in 1898, had been a high-ranked Civil Service worker in the Department of the Navy for approximately thirty-five years. She was widowed when her husband Joseph Richard passed away in 1946. Their marriage produced three sons: Thomas and Conan, the respodent/executors, and Richard, who died in 1977.
Mrs. Walsh resided in Portsmouth with her sister Margaret (who owned the house) and with her widowed sister Marion. After Marion passed away in 1977, Mrs. Walsh and Margaret moved to Red Cross Avenue in Newport. In 1988, Margaret was compelled to take up residence in a nursing home leaving Mrs. Walsh alone in the Red Cross house. Margaret had been the primary beneficiary of Mrs. Walsh's estate in two wills executed prior to the one in controversy. When Margaret was placed in the nursing home, Mrs. Walsh decided to delete her as the beneficiary and leave her (Mrs. Walsh's) estate to her sons, Conan and Thomas. To that end, Thomas drove his mother to Attorney Christopher Long's office to execute a new will and a durable power of attorney appointing Thomas as her attorney-in-fact and health care agent. Mr. Walsh neither witnessed the will nor was he present during any discussions regarding its content Attorney Long confirmed that Mr. Walsh never discussed his mother's legal affairs with him and that Mrs. Walsh made her own decisions.
In conformance with her expressed intent, the decedent left everything in like shares to Conan and Thomas who were appointed co-executors. All three of Mrs. Walsh's wills contain a paragraph which states, in pertinent part: "After careful consideration, I intentionally omit . . . my grandchildren, Jonathan Walsh and Frank Hale Walsh . . . children of my deceased son, Richard Walsh, in that they have been adequately provided for by their parents and their maternal grandparents." These omitted grandsons are now challenging the validity of the 1988 will.
Jonathan Richard Walsh testified that he in fact was not provided for by his maternal grandparents. Apparently, he had been estranged from his father over the ten years preceding the latter's death. His mother inherited nothing from his father. Jonathan's mother died in 1980 while he was in his first year of law school at Fordham. In 1985 and 1986, Jonathan served a judicial clerkship in Alaska, then returned to New York in 1987 and became and assistant district attorney. In the late 1980's, Jonathan visited his grandmother each spring and fall. He reported several incidents which he regarded as peculiar. On one occasion she ate a cake he had brought her at 4:30 p.m. "as if it were her dinner." On another night, she wanted to give him a large packet of money and indicated she was having landlord problems. He also reported that in 1988 or 1989 the incontinence of his grandmother and great aunt had caused an overpowering odor within the house.
Mr. Conan Walsh, the decedent's middle son, is a retired tax accountant residing in Mt. Laurel, New Jersey. Throughout the 1980's and until the time of his mother's death, Conan prepared his mother's personal tax returns. He did this with information the decedent provided him in telephone calls or written correspondence. Conan testified that his mother always sent appropriate documents in a timely fashion. He stated that "she positively understood me and was definitely at' sound mind? Upon visiting her two to three times a year during the period in question, Conan observed the house to be "neat, orderly and clean?
The same observation was made by Mrs. Walsh's personal physician, Dr. Henry Brownell, who had occasion to make house calls to the residence during the 1980's. Dr. Brownell also observed Mrs. Wash when she accompanied her sister on office visits. Her physical health, he testified, was consistent with her advancing age. She never exhibited any confused behavior, senility, or delusions. Dr. Brownell opined that, without question, Mrs. Walsh was "very competent."
The latter opinion was shared by Mrs. Walsh's banker, Annabeth Murphy, of Citizen's Bank. She never saw Mrs. Walsh "disoriented," "not making sense," or "doing anything unusual." Mrs. Murphy never questioned Mrs. Walsh's soundness with reference to her financial transactions.
Over the late 1980's, Mrs. Walsh was also observed by her landlord, Francis S. Cardoza, on a weekly basis. The residence was always "neat, clean and well-kept." He once approached her to inquire about late rents which was unusual for her. He also thought it odd that she offered him cash because she had always mailed him a check. In an event, Mr. Cardoza described her as apologetic, indicating that she would "take care of it."
There is abundant evidence that all during 1988, the year in which the disputed will was executed, Mrs. Walsh had the ability to competently conduct her affairs (See defendants' "J" and testimony of the co-executors).
More significantly, there is undisputed evidence that at the time of the execution of the will, Mrs. Walsh knew exactly what she was doing. The issue is whether on November 21, 1988, Mrs. Walsh had:
 "sufficient mind and memory to understand the nature of the business [s]he was engaged in when [s]he executed [her] will . . .; that [s]he had recollection of the property [s]he wished to dispose of thereby; and that [s]he knew and recalled the natural objects of [her] bounty, their deserts with reference to their conduct and treatment of [her], their necessities, and the manner in which [s]he wished to distribute [her] property among them." McSoley v. McSoley, 91 R.L 61, 78-79 (1960).
Attorney Christopher Long testified that Mrs. Walsh was prompted to alter her predecessor will because of Margaret's placement in a nursing home. Mrs. Walsh also wanted and, asked for a health care "prow" granting authority to an agent to make medical decisions in the event of mental impairment. She specified to Attorney Long that she did not wish to be kept alive by "tube feeding" or a "respirator." At the 1988 signing, Attorney Long reviewed the contents of the 1980-1986 wills with the decedent. The paragraph omitting the contestants is identical in all three wills. Attorney Long testified that Mrs. Walsh was "perfectly clear about what she wanted to do" and he had no question concerning the sufficiency of her testamentary capacity. Moreover, Thomas Walsh never discussed his mother's business with Attorney Long, never called Attorney Long and said nothing regarding the will or power of attorney.
The Court also heard the testimony of Virginia Monis who witnessed both the 1986 and 1988 wills. It was Mrs. Monis who re-typed the 1988 will to conform to Mrs. Walsh's wishes. Mrs. Monis, who has been a legal secretary for over 23 years said: "I focused on her to make sure she knew what was going on . . . There is no doubt she had the capacity." The witness also stated that the decedent was neither timid nor confused and was not "looking for assistance or guidance from anyone."
Mrs. Walsh clearly intended to omit her grandchildren from each of her wilts stating that they were otherwise provided for. Whether in fact they were otherwise provided for is of no moment. Rather, the relevant question is whether her elimination of them as beneficiaries was the product of a sound mind.
The Court is convinced by the credible evidence that Mrs. Walsh was fully aware of the provisions of her will and that those provisions reflect her unmistakable intent. She knew who the natural objects of her bounty were and consistently chose to exclude certain of them, specifically, her grandchildren, in each of the three instruments she executed. She was of competent mind when she made this choice and it was certainly her prerogative to do so.
The record is absolutely devoid of any evidence which even suggests that undue influence was exerted over the decedent. To the contrary, the evidence establishes that no-one even attempted to learn about Mrs. Walsh's personal affairs. She chose her son Thomas to be her agent because of his proximity. He was the one caring for her and visiting her frequently. She wished to have his assistance with the handling of her affairs as she advanced in age. Thomas's testimony was totally credible. He struck the court as capable and intelligent with the deportment of a gentleman.
Finally, there is no credible evidence of any irregularity in the inventory which contestants assert was not properly filed.
For all of the foregoing reasons, the petitioners' appeal of the probate of the November 21, 1988 will of Mrs. Walsh is denied